**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

RICHARD BARTULA                                                                                           PLAINTIFF

VS.                                                              CIVIL ACTION NO. 1:23-CV-280-HSO-BWR

MICHAEL GATWOOD; and
JOHN NELSON                                                                                          DEFENDANTS

**DEFENDANTS MICHAEL GATWOOD AND JOHN NELSON'S
MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR
<u>SUMMARY JUDGMENT ON BASIS OF QUALIFIED IMMUNITY</u>**

COME NOW, Defendants Michael Gatwood and John Nelson, by and through their attorneys of record, and respectfully submit this, their Memorandum Brief in Support of Summary Judgment on the Basis of Qualified Immunity. Defendants Gatwood and Nelson submit that the pleadings and discovery process have failed to establish a genuine issue of any material fact or issue of law as to them and that they are entitled to a summary judgment on the basis of qualified immunity as a matter of law. Specifically, Defendants Gatwood and Nelson submit that their actions in arresting Richard Bartula were objectively reasonable under the three-part test announced by the U.S. Supreme Court. Defendants Gatwood and Nelson further submit that even if their actions could somehow be determined to be excessive, there was no case law at the time of their encounter with Mr. Bartula which would have placed them on notice that they were violating a clearly established constitutional right. Consequently, Defendants are protected by qualified immunity and should be dismissed from this suit as a matter of law.

**STATEMENT OF APPLICABLE FACTS**

The present matter arises from an encounter between Plaintiff Richard Bartula and Hancock County sheriff deputies Michael Gatwood and John Nelson on April 18, 2023. (See Plaintiff's First Amended Complaint, attached to Motion for Summary Judgment as Exhibit 1).

The entire encounter, starting with when Officer Gatwood first saw Plaintiff Bartula driving on Texas Flat Road, is captured on dash and body cam video. (See Gatwood dashcam footage, attached to Motion for Summary Judgment as Exhibit 2; body cam footage of Officer Gatwood, attached to Motion for Summary Judgment as Exhibit 3, and body cam footage of Officer Nelson, attached to Motion for Summary Judgment as Exhibit 4). A summary of the encounter can also be found in the Hancock County Sheriff's Office incident report. (See report, attached to Motion for Summary Judgment as Exhibit 5).

The incident started when Officer Gatwood was dispatched to the area of Texas Flat Road for report of a reckless driver. The report stated that a light golden dually pickup truck was driving in a reckless manner, and all over the road. (See Exhibit 5 to Motion for Summary Judgment, page 3, narrative of Officer Gatwood).

While approximately 300 feet from Texas Flat Road, Officer Gatwood observed a 2006 GMC 3500 dually pick up traveling north on Highway 603. Because this matched the description given in the "be on the Lookout" (BOLO) report, Gatwood turned around to follow the vehicle and observe for possible reckless driving. (Exhibit 5 to Motion for Summary Judgment, page 3, narrative of Officer Gatwood).

During a couple miles of observing, Officer Gatwood observed the vehicle swerve and cross the center line of the road on three separate occasions, all of which was consistent with the BOLo report. Given his observations, Officer Gatwood engaged his patrol car lights and siren.

(See Exhibit 2- Showing swerving vehicle and light/siren initiation; see also Exhibit 5- Officer Incident Report).

Because the vehicle's driver did not pull over or heed the sirens and lights, Officer Gatwood changed the tone of his siren several times to make sure that the driver of the pick-up was aware of his presence and the need to pull over. (See Exhibit 2). During this pursuit, the speed of the pick-up truck ranged from 5 mph to 55 mph, and the driver (later identified as Plaintiff Richard Bartula) never showed any intent to stop in response to the clear sirens and lights of Officer Gatwood. (Exhibit 5 to Motion for Summary Judgment, page 3, narrative of Officer Gatwood; Exhibit 2 to Motion for Summary Judgment-Gatwood dashcam video).

As evidenced by the video footage, Officer Gatwood continued his pursuit of this vehicle even after the vehicle made a left hand turn onto Fenton-Dedeaux Road. On Fenton-Dedeaux Road, the pick-up truck again crossed the center line again, almost sideswiping a silver pick up truck traveling in the opposite direction. Plaintiff Bartula continued driving his truck north on Fenton-Dedeaux Road, all the while failing to maintain his lane of travel and failing to stop in response to Officer Gatwood's sirens and lights. On one occasion, a vehicle traveling in the opposite direction had to leave the roadway and into the ditch to avoid a head on collision. (Exhibit 5 to Motion for Summary Judgment, page 3, narrative of Officer Gatwood; Exhibit 2 to Motion for Summary Judgment-Gatwood das cam video).

During Officer Gatwood's pursuit, Officer John Nelson responded to the area. Nelson caught up with Bartula and Officer Gatwood on Fenton-Dedeaux Road near Kiln-Delisle Road. Officer Nelson also observed Bartula cross the center line into oncoming traffic multiple times, forcing other vehicles off the road. (Exhibit 5 to Motion for Summary Judgment, page 4, narrative of Officer Nelson; Exhibit 2 to Motion for Summary Judgment-Gatwood dashcam video).

After the pursuit, which lasted between 5-10 minutes, Bartula finally stopped his vehicle at 19351 Fenton-Dedeaux Road. Officer Gatwood approached Bartula's vehicle from the passenger side and Officer Nelson approached Bartula's vehicle from the driver's side. (Exhibit 5 to Motion for Summary Judgment, page 3, narrative of Officer Gatwood, page 4, narrative of Officer Nelson; Exhibit's 3 and 4 to Motion for Summary Judgment-Gatwood and Nelson body cam videos).

While Officer Nelson was approaching the vehicle, he observed the driver door open, at which time, Officer Nelson grasped Bartula's left arm and ordered him out of the vehicle. Bartula then pulled away from Officer Nelson, attempting to reach towards the passenger area of the vehicle. At this time, Officer Nelson removed Bartula from the vehicle and they went to the ground. Officers Nelson and Gatwood then secured Mr. Bartula's arms and placed him into handcuffs. (Exhibit 5 to Motion for Summary Judgment, page 3, narrative of Officer Gatwood, page 4, narrative of Officer Nelson; Exhibit's 3 and 4 to Motion for Summary Judgment-Gatwood and Nelson body cam videos).

Once Bartula was secured with handcuffs, there was no further use of force of any kind. There were no punches, kicks and no use of a taser. In fact, when Mr. Bartula needed to get up and advised that he may be injured, the officers carefully assisted Bartula to his feet to a seat in the back of his truck. (Exhibit's 3 and 4 to Motion for Summary Judgment-Gatwood and Nelson body cam videos).

After Bartula had been handcuffed, communications ensued between various officers and Bartula. Bartula spoke with a slightly slurred speech and appeared unable to comprehend questions. (Exhibit 5 to Motion for Summary Judgment, page 3, narrative of Officer Gatwood, page 4, narrative of Officer Nelson; Exhibit's 3 and 4 to Motion for Summary Judgment-Gatwood

and Nelson body cam videos). Bartula and his neighbors can also be heard on the body cam footage explaining that he recently suffered a leg injury, had experienced several falls and was unable to walk without support. Neighbors also mentioned that Bartula's mental state could have been impacted by the variety of medications that he takes daily. (Exhibit's 3 and 4 to Motion for Summary Judgment-Gatwood and Nelson body cam videos).

The multiple occasions demonstrating Bartula's reckless driving are detailed on pages 6 and 7 of the Hancock County Sheriff's Department incident report, which provides a detailed timeline citing to dashcam footage from Officer Gatwood's vehicle- that specifies the multiple occasions when Bartula's vehicle swerved off or across the centerline of the roadway. (Exhibit 5 to Motion for Summary Judgment, pages 6-7, summary of incident and timeline for dashcam video footage).

Although the video footage is clear and captures the entire incident, depositions were also taken of Plaintiff Bartula, Officer Gatwood and Officer Nelson. (See Exhibit 6 to Motion for Summary Judgment- deposition of Richard Bartula; Exhibit 7 to Motion for Summary Judgment- deposition of Officer Michael Gatwood, and Exhibit 8 to Motion for Summary Judgment- deposition of Officer John Nelson).

Bartula testified that he has very little recollection of the incident, including little memory of driving that day or the occurrence; he does; however, remember going to the hospital, and being told that he had a stroke. (Exhibit 6 to Motion for Summary Judgment, pg. 11, lines 1-9). Bartula acknowledged watching the dashcam footage from Officer Gatwood's vehicle and agreed that based on the video depiction, he was driving erratically and should not have been operating a vehicle that day. (Exhibit 6 to Motion for Summary Judgment, pg. 12, lines 1-10). Bartula admitted that the videos show a lot of things that he does not remember. (Exhibit 6 to Motion for

Summary Judgment, pg. 16, lines 5-18).   He has no recollection of two police cars, with sirens and flashing lights activated, being behind his vehicle and trying to get him to pull over. (Exhibit 6 to Motion for Summary Judgment, pg. 19, lines 10-17).

Bartula agreed that Officers Gatwood and Nelson had legitimate reason to be concerned after seeing the way that he was driving during the 5-6 miles that they pursued and tried to stop him. (Exhibit 6 to Motion for Summary Judgment, pg. 21, lines 9-15).   Bartula initially denied opening his driver side door as the officers were approaching his vehicle, but after reviewing the video, he admitted that it was he who opened the door as the officer approached. (Exhibit 6 to Motion for Summary Judgment, pg. 22, line 4 through pg.23, line 24).   Bartula also admitted that there was no physical contact with the officers until he had driven away from them for seven miles, nearly hitting several cars head on, and swerving off the road multiple times.   (Exhibit 6 to Motion for Summary Judgment, pg. 23, line 22 through pg. 24, line 13).

Officer Gatwood testified about the incident and the circumstances which led to his encounter with Mr. Bartula.   Officer Gatwood's testimony was consistent with the incident report and video footage. (Exhibit 7 to Motion for Summary Judgment, pg. 7, line 1 through pg. 8, line 20).   Officer Gatwood testified that Mr. Bartula's vehicle still posed a danger, even though it had stopped, so long as Mr. Bartula remained in control of the vehicle. (Exhibit 7 to Motion for Summary Judgment, pg. 16, lines 3-6).

Officer Nelson also testified about the incident consistent with the video footage and incident report. (Exhibit 8 to Motion for Summary Judgment, pg. 6 line 18 through pg. 8, line 5). Officer Nelson testified that once the Bartula vehicle stopped, he approached the vehicle and saw the driver door open.   Officer Nelson ran up, grabbed Mr. Bartula's arm, told him to get out of the vehicle, at which time, Bartula pulled away. As Bartula was pulling away, Nelson grabbed

him, escorted him out of the vehicle and placed Bartula on the ground. (Exhibit 8 to Motion for Summary Judgment, pg. 8, lines 6-16). Officer Nelson was concerned about Bartula pulling away and thought that Bartula may be reaching back into the vehicle to gain access to something inside the vehicle. (Exhibit 8 to Motion for Summary Judgment, pg. 12, lines 15-22).

## LAW AND ARGUMENT

### A.     Applicable law on qualified immunity.

The United States Supreme Court has emphasized that qualified immunity from a claim of excessive force is necessarily fact-intensive. *Graham v. Connor*, 490 U.S. 386, 396-397 (1989). The inquiry requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-397.

When video evidence is available depicting the encounter between the Plaintiff and officers, the facts are viewed in light of the videotape and greater weight, even at the summary judgment stage, is given to the video recording taken at the scene. *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022). The Fifth Circuit Court of Appeals has held that a "court of appeals need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider the facts in the light depicted by the videotape." *Carnaby v. City of Houston*, 636

F.3d 183, 187 (5th Cir. 2011).

The Fifth Circuit Court of Appeals has had many opportunities to evaluate assertions of qualified immunity, and one recent case, *Salazar v. Molina*, 37 F.4th 278 (5th Cir. 2022), is very similar to the facts presented in Richard Bartula's incident. *Salazar v. Molina*, 37 F.4th 278 (5th Cir. 2022).

In *Salazar*, the plaintiff Salazar led police on a high speed chase, and after Salazar eventually stopped, a sheriff's deputy tased and handcuffed Salazer, which Salazer alleged supported his claim of excessive force. *Salazar*, 37 F.4th at 280. The entirety of the pursuit was captured on dashcam video.

Similar to the facts at issue in the instant action, in Salazar, the facts demonstrated that around 2:00 a.m. on the incident date, the defendant sheriff's deputy tried to pull over Juan Carlos Salazar for speeding. *Salazar*, 37 F.4th at 280. Instead of stopping, Salazar accelerated and led police on a high-speed chase for approximately five minutes. *Id.* At one point, Salazar traveled in excess of 70 miles per hour on a narrow residential street. *Id.* Eventually, two police vehicles were able to block Salazar's pathway forward. At that point, Salazar stopped his vehicle, got out, dropped to his knees next to the car, and raised his hands. Five seconds after stopping his car, Salazar was lying prone on the ground. *Id.* at 280.

Just as Salazar finished lowering himself to the ground, Deputy Juan Molina brought his patrol car to a stop behind Salazar's vehicle. Molina exited his vehicle and ran toward Salazar. Salazar remained on the ground but uncrossed his legs two seconds before Molina got to him. Upon reaching Salazar—eight seconds after Salazar had stopped his car—Molina fired his taser at Salazar's back. The video shows that Salazar tensed up and his upper body shook for approximately six seconds. Molina says he deployed his taser just once, shocking Salazar for one

five-second cycle. Salazar contends that Molina kept his finger on the taser and triggered a second cycle, tasing Salazar for a total of ten seconds. After the tasing, Molina removed the taser prongs from Salazar's back and handcuffed Salazar. Molina then helped Salazar up and walked him to a patrol car. Salazar was back on his feet less than a minute after lying down next to his car. *Id.*

Suit was brought by Salazar against Officer Molina, making a claim of excessive force under the Fourth Amendment. Officer Molina moved for summary judgment, asserting that his actions were objectively reasonable under the circumstances, and he was thus entitled to qualified immunity. *Id.* at 281. The officer's summary judgment motion was denied by the district court, who concluded that there were material factual disputes as to whether a reasonable officer would have viewed Salazar as an immediate threat, whether Salazar's apparent surrender was a ploy to evade arrest, and whether Salazar was tased once or twice. *Id.* The Fifth Circuit Court of Appeals reversed the district court and rendered judgment for Officer Molina. *Id.* at 280.

The Fifth Circuit began by analyzing the first part of the U.S. Supreme Court test- the severity of the crime at issue. The Fifth Circuit agreed with the district court's finding that this factor weighed in favor of Molina and against a finding of excessive force. As to that point, the Fifth Circuit held in pertinent part as follows:

> Salazar led police on a dangerous car chase through a residential area and was charged with the felony of evading arrest with a vehicle. The district court accordingly found that the first *Graham* factor weighed against a finding of excessive force. It further noted that leading law enforcement in a high-speed chase through a heavily populated area is a serious crime that puts at risk not only the lives of Plaintiff and the officers but also those of the general public. This finding comports with our cases, which have found far less dangerous offenses to be serious for purposes of the first *Graham* factor.

*Id.* at 281-282.

The Fifth Circuit then turned to the second part of the test- whether the suspect posed an immediate threat to the safety of the officers or others. The district court determined that this factor weighed in favor of Salazar and supported a finding of excessive force. Salazar argued,

Page **9** of **19**

and the district court agreed, that he posed no threat to anyone's safety because he was not suspected of a violent offense, adopted a non-threatening position of surrender after exiting his vehicle, and the officer could see Salazar's hands to know that he was not wielding a weapon. *Id.* at 282.

The Fifth Circuit disagreed, saying that Salazar's position comported with neither common sense nor our precedent. *Id.* The Fifth Circuit emphasized that what preceded the surrender matters. The Fifth Circuit said that "a reasonable officer will have little cause to doubt the apparent surrender of a compliant suspect who has not engaged in dangerous or evasive behavior. But when a suspect has put officers and bystanders in harm's way to try to evade capture, it is reasonable for officers to question whether the now-cornered suspect's purported surrender is a ploy. That's especially true when a suspect is unrestrained, in close proximity to the officers, and potentially in possession of a weapon." *Id.*

The Fifth Circuit also made clear that their precedent forecloses this argument by Salazar in that they have "repeatedly refused to hold that "*any* application of force to a compliant arrestee is *per se* unreasonable." *Id.* The Fifth Circuit added the following very important language:

> As *Escobar* illustrates, a suspect cannot refuse to surrender and instead lead police on a dangerous hot pursuit—and then turn around, appear to surrender, and receive the same Fourth Amendment protection from intermediate force he would have received had he promptly surrendered in the first place. Like *Escobar,* this case involves a fleeing felony suspect who eventually decided to surrender and was then temporarily subjected to intermediate force.

*Id.* at 282-283.

The Fifth Circuit stated that the use of force does not always require that a suspect be actively resisting, fleeing, or attacking an officer at the precise moment force is used. Instead, the relevant inquiry is whether the officer used a justifiable level of force in light of the continuing threat of harm that a reasonable officer could perceive, with one question being sufficient time has elapsed for the officer to perceive new information indicating the threat was past. *Id.* at 283.

When discussing the third *Graham* factor- whether the suspect is actively resisting arrest or attempting to evade arrest by flight- the Fifth Circuit concluded that they involved the same facts as the second part of the test, and likewise supported a conclusion of no excessive force. *Id.*

The Fifth Circuit found it particularly relevant that Salazar had just spent five minutes attempting to evade arrest by flight in a highly dangerous manner, and then quickly exited his car without a command and looked toward an open area—rather than staying in his vehicle and awaiting a command. The Fifth Circuit held that "if anything, these facts made it just as reasonable for Molina to fear that Salazar still sought to escape as it was for Molina to fear that Salazar was a threat to his or others' safety." *Id.* at 284.

The Fifth Circuit went on to hold that even if the facts had established a claim of excessive force, Salazar's claim would nonetheless fail because he was unable to show that Officer Molina's conduct violated a clearly established constitutional right. The Fifth Circuit said that per instructions from the U.S. Supreme Court, "clearly established law is not to be defined at a high level of generality." *Id.* at 285 (citing *City of Tahlequah v. Bond*, 142 S.Ct. 9, 11 (2021).

What this means is that "the rule's contours must be so well established that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* at 285. "To show a violation of clearly established law, [Salazar] must identify a case that put [Molina] on notice that his specific conduct was unlawful." *Id.* The Fifth Circuit reviewed their precedent, as well as the cases cited by Salazar, and concluded that the violation alleged by Salazar did not amount to violation of a clearly established right. *Id.*

Another recent 2022 case from the Fifth Circuit Court of Appeals, also discusses qualified immunity and supports a finding of no constitutional violation in the present matter. *Ramirez v. Martin*, 2022 WL 16548053 (5th Cir. 2022).

In *Ramirez*, the basic facts were that Ramirez, driving while intoxicated, led police on a car chase before finally stopping on a residential street. After he exited his vehicle, he initially failed to comply with officer commands. As Officer Christopher Martin arrested Ramirez, he grabbed Ramirez's arm and pushed him to the ground, causing his head to hit the pavement and cutting his forehead. Ramirez sued Martin for using excessive force. The district court granted Martin's motion to dismiss on the basis of qualified immunity, and the Fifth Circuit affirmed. *Id.* at *1.

Ramirez had voluntarily stopped his vehicle after an approximate 1 ½ mile pursuit. After stopping, Ramirez exited the vehicle and turned towards the officers. Officer Martin, who was already approaching the vehicle, told Ramirez to get on the ground, and Ramirez went down to his knees. The plan at this point was to handcuff Ramirez, and during that process, Ramirez went down to the ground, hitting his head and causing a significant cut above his right eye. *Id.* at *1. The entire sequence of events was recorded on multiple video cameras. *Id.* at *2.

Ramirez's argument in support of excessive force was that "no jury could reasonably believe he posed a threat to the officers' safety, because, when Martin used force, Ramirez had already surrendered, was compliant, and was on his knees." *Id.* at *2. The Fifth Circuit rejected this argument, and citing the *Salazar* opinion discussed above, said that "we cannot ignore a suspect's actions that immediately preceded the surrender….such actions are pertinent because an officer need not take a suspect's compliance at face value after the suspect just tried evading custody." *Id.* at *2 (citing *Salazar v. Molina*, 37 F.4th 278, 282 (5th Cir. 2022)).

The Fifth Circuit concluded that "Here, Martin had reasons both to doubt Ramirez's compliance and to view him as a threat. Ramirez's purported surrender came mere seconds after he disobeyed commands to stay in his car and to drop to his knees, and only a few minutes after

he led officers on a nighttime car chase before stopping on an unlit street." *Id.* at *3.

Importantly, the Fifth Circuit said that "even assuming Ramirez legitimately intended to surrender, he cannot expect the same Fourth Amendment protection from ... force he would have received had he promptly surrendered in the first place." *Id.* at *3 (citing *Salazar*, at 282-283). The Fifth Circuit determined that taking Ramirez to the ground, as opposed to using intermediate force by tasing him, was a ratcehing down of force and even stronger support of qualified immunity by using no additional force once Ramirez was subdued and handcuffed. *Id.* at *3. The implication from this holding is that taking a suspect to the ground, after he has just led police on a pursuit, is minimal force at most, and justified as a way to subdue and arrest the suspect.

**B.    Analysis of the relevant law with the facts of this case.**

There is little question that the facts of this case entitle Officers Gatwood and Nelson to qualified immunity. There was no clearly established constitutional violation, and in fact, the relevant precedent demonstrates the objective reasonableness of the officers' actions in this case. In addition, all three of the U.S. Supreme Court factors from *Graham* support the grant of qualified immunity in this case.

**1. The severity of the crime at issue.**

As is undisputed by the dashcam footage from Officer Gatwood's vehicle, Mr. Bartula committed a very serious offense. Bartula is seen weaving all over the road, crossing the center line on numerous occasions, and nearly hitting several vehicles head on. Bartula is seen continuing to drive and ignoring the lights and sirens from the vehicles of both officers. Bartula refuses to pull over and leads the officers on a very dangerous pursuit for several miles that lasted between 5-10 minutes. Bartula has explained his erratic driving by saying that he may have had a stroke, but even if that were true, the officers would have no way of knowing it, and the officers'

only knowledge of the situation was that Bartula nearly hit several vehicles head on, was driving all over the road and refused to stop in response to the flashing lights and sirens.

There is really no question in this case that the severity of the crime at issue supports a finding of qualified immunity. It is much more serious that the crimes at issue in many prior cases from the Fifth Circuit, and is essentially identical to what was issue in both the *Salazar* and R*amirez* cases discussed above. In fact, in both *Salazar* and *Ramirez*, the Plaintiffs did not even dispute that this factor weighed against their claims and supported a conclusion of qualified immunity.

### 2. Whether Mr. Bartula posed an immediate threat to the safety of the officers or others.

There seems little question that this factor also weighs against the claims of Bartula and supports the grant of qualified immunity. Here, Bartula had control of a large pick up truck that was weaving all over the road and had nearly hit several vehicles head on. The safety of the officers and the public was in serious jeopardy if Bartula continued to drive his vehicle in this manner. The officers had every reason to believe that Bartula was impaired and posed a danger.

While true that Bartula did eventually stop his vehicle, he had just refused to stop for over 5 minutes while being pursued, and pursuant to both *Salazar* and *Ramirez*, the officers had every reason to believe that Bartula's stopping of the vehicle was a ploy to evade arrest. At the point in time when Bartula stopped his truck, the officers could not know if Bartula was planning to drive off again, and they also could not know what weapons Bartula may have in the vehicle.

Bartula did testify that he stayed in the vehicle, and it was the officer who opened his door, but this testimony is clearly disputed by the video footage, which Mr. Bartula acknowledged during his deposition. Officers Nelson and Gatwood had no way of knowing whether, e.g. Bartula was opening the door to make a run for it, opening the door to exit the vehicle and engage

the officers, and/or perhaps most concerning, did he have a gun in the vehicle, and was opening the door to fire at the officers?

These were all legitimate concerns for the officers, and specifically why a police officer's actions are not judged by hindsight or looking back at what was determined after the fact. These legitimate concerns were very well explained by the Fifth Circuit in *Salazar*, then the court held that "when a suspect has put officers and bystanders in harm's way to try to evade capture, it is reasonable for officers to question whether the now-cornered suspect's purported surrender is a ploy. That's especially true when a suspect is unrestrained, in close proximity to the officers, and potentially in possession of a weapon." *Salazar*, 37 F.4th at 282.

Those are the precise facts at issue as it pertains to Mr. Bartula. Mr. Bartula had just placed a lot of people in danger while leading the officers on a pursuit, and even though he did eventually stop his truck, Bartula was unrestrained, in close proximity to the approaching officers and potentially in possession of a weapon. Bartula further escalated the situation by not waiting for a command from the officers and opening his door while they were approaching. Bartula went even one step farther by trying to reach back into the vehicle when Officer Nelson initially engaged Bartula and tried to get him away from the vehicle.

With the facts of this case, undisputed because of the video evidence, it is clear that until Mr. Bartula was removed from his truck, he posed an immediate threat to the officers and the general public.

### 3. Was Mr. Bartula actively resisting arrest or attempting to evade arrest by flight.

There is also no question that this factor weighs against Bartula and supports a grant of qualified immunity to the officers. As made clear by both the *Salazar* and *Ramirez* decisions above, this factor weighs against a suspect who has led police on a pursuit, even if he/she

eventually ends the pursuit and surrenders.

In *Salazar*, the Fifth Circuit found it particularly relevant that Salazar had just spent five minutes attempting to evade arrest by flight in a highly dangerous manner, and then quickly exited his car without a command and looked toward an open area—rather than staying in his vehicle and awaiting a command. The Fifth Circuit held that "if anything, these facts made it just as reasonable for Molina to fear that Salazar still sought to escape as it was for Molina to fear that Salazar was a threat to his or others' safety." *Id.* at 284.

Like Salazar, Bartula has just spent 5+ minutes attempting to evade arrest by fleeing from the officers in a highly dangerous manner. Like Salazar, Mr. Bartula attempted to exit his car without waiting for a command; a fact that made it more than reasonable for the officers to conclude that Bartula was planning to flee or even worse, engage the officers with a weapon.

In *Ramirez*, the court determined that Ramirez was still a threat to flee even though he had exited the vehicle and gotten on his knees. The Fifth Circuit explained that they cannot ignore a suspect's actions that immediately preceded the surrender….such actions are pertinent because an officer need not take a suspect's compliance at face value after the suspect just tried evading custody." *Ramirez v. Martin*, 2022 WL 16548053*2 (5th Cir. 2022).

The Fifth Circuit also said that "even assuming Ramirez legitimately intended to surrender, he cannot expect the same Fourth Amendment protection from ... force he would have received had he promptly surrendered in the first place." *Id.* at *3 (citing *Salazar*, at 282-283).

In this case, Bartula led officers on a 5+ minute very dangerous pursuit where he nearly hit several vehicles head on, attempted to exit his vehicle before being commanded to do so, and as such, he cannot expect to have the same Fourth Amendment protections he would have had if he had promptly surrendered in the first place.

### 4. Whether the officers actions violated a clearly established constitutional right.

The court only gets to this question if it is first determined, using the three *Graham* factors above, that any constitutional violation occurred.  As explained and outlined above, no constitutional violation can be shown, but even if it could, it was not clearly established at the time of this incident.

Counsel for the defendants could find no case in the Fifth Circuit or otherwise which found a viable claim for excessive force when a police officer did nothing other than take a suspect to the ground to handcuff them after that suspect led the officers on a dangerous pursuit, and showed no indication of surrender at any point prior to being handcuffed.

To the contrary, the *Ramirez* and *Salazar* decisions discussed above, are both from 2022 and determined that qualified immunity was available to officers whose conduct was very similar in nature to what is present in Mr. Bartula's case.

In *Ramirez*, the Fifth Circuit held that taking Ramirez to the ground, as opposed to using intermediate force by tasing him, was a ratcehing down of force and even stronger support of qualified immunity by using no additional force once Ramirez was subdued and handcuffed. *Id.* at *3.  The implication from this holding is that taking a suspect to the ground, after he has just led police on a pursuit, is minimal force at most, and justified as a way to subdue and arrest the suspect.

The logical inference to be drawn from *Ramirez*, decided less than two years ago, is that an officer will not be subject to a claim for excessive force when he takes a suspect to the ground to arrest him, and commits no other acts of force.   This will especially be true when that suspect has fled from an attempted traffic stop, and during the pursuit, endangers the safety of the officers as well as the general public.

The cases of *Salazar* and *Ramirez*, combined with the absence of any case law to the

contrary, would certainly not have placed either of the officers in the present case on notice that their actions in arresting Richard Bartula would violate a clearly established constitutional right, and subject them to a claim for excessive force.

## CONCLUSION

Analyzing the facts of the present case against the relevant law clearly establishes that Defendants Gatwood and Nelson are entitled to summary judgment on the basis of qualified immunity. They did nothing other than apprehend a fleeing suspect, and one that showed no indication of surrender. In addition, the minimal force used to subdue and ultimately handcuff Richard Bartula was less than the force used in other recent cases where qualified immunity was found. As such, there was no notice to Officers Gatwood and Nelson, that even if their conduct could somehow be determined to be excessive, that such conduct violated a clearly established constitutional right. For all of the reasons outlined above, Officers Gatwood and Nelson are entitled to qualified immunity, and summary judgment should be granted.

WHEREFORE, PREMISES CONSIDERED, Defendants Michael Gatwood and John Nelson respectfully request that this Court enter an Order granting their Motion for Summary Judgment, and dismissing the Plaintiff's action against them with prejudice.

Respectfully submitted, this the 12th day of March, 2024.

**Michael Gatwood; and John Nelson**, Defendants

/s Robert E. Briggs
Robert E. Briggs, MSB 99527

**WILLIAMS AND ASSOCIATES**
Post Office Box 2903
Hartford, CT 06104-2903
*Physical Address*
10 Canebrake Blvd., Suite 220
Flowood, MS 39232
Telephone: (601) 572-3535
Email:   bbriggs@travelers.com

**CERTIFICATE OF SERVICE**

  I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

  Daniel M. Waide, Esq.
  Johnson, Ratliff & Waide, PLLC
  1300 Hardy Street
  Hattiesburg, MS 39404

This the 12th day of March, 2024.

                 /s/Robert E. Briggs, III
                Robert E. Briggs, III